IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| **FARADAY CAPITAL LIMITED,** | : | |
| | : | |
| Plaintiff/Counter Defendant, | : | |
| | : | |
| v. | : | |
| | : | No. 5:10-CV-278 (CAR) |
| **325 GOODRICH AVENUE, LLC,** | : | |
| | : | |
| Defendant/Counter Claimant/ | : | |
| Third-Party Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| **BB&T INSURANCE SERVICES, INC.,** | : | |
| **d/b/a DEJARNETTE & PAUL,** | : | |
| | : | |
| Third-Party Defendant/Counter | : | |
| Claimant, | : | |
| | : | |
| v. | : | |
| | : | |
| **CRC INSURANCE SERVICES, INC.,** | : | |
| Third-Party Defendant. | : | |
| _____ | : | |

**ORDER ON THIRD-PARTY DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT**

Before the Court are Third-Party Defendants', BB&T Insurance Services, Inc.

d/b/a/ DeJarnette & Paul ("BB&T") and CRC Insurance Services Inc. ("CRC"), Motions

1

for Summary Judgment [Docs. 125, 126].  In their Motions, BB&T and CRC request judgment as a matter of law as to Third-Party Plaintiff 325 Goodrich Avenue, LLC's ("Goodrich") claims of fraud and breach of contract under Virginia law, or, in the alternative, negligent procurement under Georgia law.  After considering the facts and relevant law, the Court concludes that summary judgment as a matter of law is due to be granted to both BB&T and CRC.  Accordingly, BB&T's Motion for Summary Judgment [Doc. 125] and CRC's Motion for Summary Judgment [Doc. 126] are **GRANTED**.

## BACKGROUND

The instant action arises from Plaintiff Faraday Capital Limited's ("Faraday") request for a declaratory judgment as to its rights, obligations, and duties under a commercial property insurance policy (the "Policy") issued to Goodrich.  In a previous summary judgment Order, the Court concluded that the Policy did not provide coverage for any alleged loss or damage as a result of sprinkler leakage that occurred on October 8, 2008 (the "Incident").  [Doc. 176].  Thus, because the Court concluded

2

that the Policy provided no coverage for Goodrich's alleged loss, presently at issue before the Court is whether BB&T and CRC are liable for procuring the Policy.[1]

325 Goodrich Avenue, LLC, is a Georgia company formed by Virginia and Maryland based investors, Matthew Appelget, Greg Rochlin, and Justin French, to purchase a former B.F. Goodrich tire cord manufacturing facility located at 325 Goodrich Avenue in Thomaston, Georgia (the "Property"). The Property, known locally as Martha Mills, consists of eleven buildings, including, most relevantly, two old warehouses ("Buildings A and B") that sustained alleged water damage in the Incident. Goodrich bought the Property intending to renovate the buildings, or harvest, resell, and rehabilitate some of the antique hardwood floors.

BB&T is an insurance agency located in Richmond, Virginia, and CRC is a wholesale surplus lines insurance broker with offices in Birmingham, Alabama. BB&T, as agent or broker to insurance applicants for hard-to-place businesses like Goodrich, retains CRC to access certain insurance carriers like Faraday. CRC is Faraday's agent and has binding authority to commit Faraday to issue a policy. BB&T was Goodrich's official insurance agent of record.

Goodrich's Quest for Insurance Coverage

---

[1] See the Court's Order on Parties' Cross-Motions for Summary Judgment for additional facts regarding the terms and conditions of the Policy and the Court's interpretation of the Policy. [Doc. 176].

In June 2008, Goodrich purchased the Property for $1 million. Immediately thereafter, French and Appelget, both principals of Goodrich, sought to procure insurance for the Property through various insurance brokers. Goodrich sought insurance largely to protect the Property's salvageable wood for a reasonable premium with a total insured value ("TIV") between $6 million and $10 million. This endeavor, however, proved to be difficult because the insurance companies that Goodrich approached valued the Property at approximately $40 million.

French spoke with BB&T broker Jay Paul several times throughout the summer about obtaining insurance coverage for the Property. During these conversations French was "brutally honest" about wanting "at least $6 million" in coverage. French Dep. 83:8-16. On July 28, 2008, Lauren Davis, a consulting associate for French, e-mailed Paul a document containing information about each building on the Property and reminded him that French wanted the entire property "valued between 6 and 10 million dollars."[2] [Doc. 125-7].

In a lengthy response, Paul asked Davis specific questions about the Property, including what the total acreage was, whether there were sprinklers in the buildings, and what French's eventual plans for renovation were. Calculating that the Property's

---

[2] Davis had access to French's e-mail account and often wrote e-mails on behalf of French. This specific e-mail correspondence, however, was from her account.

4

value per square foot totaled over $50 million, Paul expressed concern about the wide "spread in value" of the Property's worth and wondered "how to justify [this TIV discrepancy] to any insurance company." Id.  Paul also explained that insurance could be provided in one of three ways: Actual Cash Value ("ACV"), Replacement Cost, and Agreed Amount.  He noted that replacement cost would likely "be the most expensive as the buildings in question would probably not be constructed of like kind and quality if destroyed" and that ACV "would pay the fair market value of the property in the event of a loss." Id.  Paul also noted that in the event of a partial loss in a building, ACV may "not pay to bring the building back to like kind and quality." Id.

French interpreted Paul's response, especially his calculation, to indicate that Paul had not understood the type of insurance coverage he wanted.  French reminded Paul that he did not want replacement coverage, but instead he wanted something to "cover the materials," presumably meaning the hardwood floors.[3]  French Dep. 246:21.

Application for Insurance

---

[3] French uses the phrase "cover the materials" and "cover the loss of the wood" interchangeably. Compare French Dep. 246:21 ("I want something to cover the materials,") with Id. at 236:18 ("I wanted insurance that would cover the loss of the wood").  Despite this arguably confusing terminology, the Court will accept French's fluid use of "materials" to refer to the "wood."

On behalf of Goodrich, Paul prepared, signed, and submitted an Insurance Application (the "Application") to various insurance brokers on August 14. Paul stated that he was seeking coverage against "special" causes of loss in the amount of $6 million. [Doc. 125-10]. Paul, however, did not specifically list any of the special causes of loss. He also attached the following documents to the Application: a sketch of the buildings, a document that contained information about each building, and a narrative about Goodrich and its plans for the Property. These documents were either prepared by French or were prepared at his direction. Reading the facts in the light most favorable to Goodrich, however, Goodrich neither reviewed the Application that Paul prepared nor knew that the documents French had prepared were attached.

CRC's Underwriting, Negotiations, and Binding

By the beginning of September, BB&T still had not obtained an insurance quote, and Goodrich was "getting a little antsy." [Doc. 125-17]. On September 5, Deborah Isbell, another BB&T broker, sent a copy of the Application and attached documents to CRC requesting an insurance quote. Isbell informed CRC that "today's [her] last chance" to bind coverage for Goodrich and that she needed to "present an offer [to Goodrich] today…." Id. There is no indication in the record that Isbell was aware of anything unique or special about Goodrich's requested coverage.

6

The Application was reviewed by CRC employees Mason Johnson and Lucy Dingledy who had binding authority from Faraday. Although CRC was initially unsure about the details of the Property, it eventually learned that the Property was "a group of vacant buildings that [were] being refurbished … [and had a] $6M TIV." [Doc. 125-17, p. 2-3].

On September 8, CRC had an indication of coverage. That morning, CRC Property Broker Trey Nelson informed Isbell of its indication and inquired into whether the buildings were "sprinklered" so that it could "firm up a quote." [Doc. 125-21]. Isbell forwarded Nelson's indication to Paul and also e-mailed French and Davis the "GREAT news" that CRC had provided an indication of coverage for Basic Perils and ACV. [Doc. 125-22] (emphasis in original). In her e-mail, she explained that "basic perils" coverage included coverage for: "Fire, Lightening, Explosion, Windstorm, Hail, Smoke, Aircraft, Vehicles, Riot, Civil Commotion, Vandalism, Sprinkler Leakage, Sinkhole Collapse and Volcanic Action." Id. She also relayed Nelson's question about the sprinklers.

Davis, on behalf of French, quickly responded to Isbell's e-mail, agreeing that CRC's indication was "great news." [Doc. 125-23]. She also requested a list of exclusions and informed Isbell that Goodrich "would otherwise like to move towards

7

binding." Id. In response to Nelson's question about the sprinklers, Davis stated that "the buildings have sprinklers but they are not turned on." Id.

That afternoon, Paul also e-mailed French and Davis to further explain the indication of coverage provided by CRC. Paul explained that basic coverage meant "that the only things covered are that which are listed on the policy." Id. Perhaps answering Davis' earlier question to Isbell about exclusions, he distinguished special coverage from basic coverage by explaining that the former "covers everything except what is specifically excluded." Id. Paul further noted that he understood French wanted "bare bones coverage to protect the property from obvious perils" until French "determined which properties to raze and which to keep and renovate." Id. That evening, French responded to Paul's e-mail and stated, "Jay, This is good news. Matthew and I would like to bind the property. We should discuss in detail which properties are in finished condition and have a higher per square foot value." [Doc. 125-25].

The next day on September 9, Paul notified French that the premiums had adjusted upwards because none of the sprinklers on the Property were operational. Paul forwarded CRC's two quote options: (1) $39,660 premium with a $10,000 deductible, $6,000,000 limit; or (2) $35,660 premium, with a $25,000 deductible. Both

8

options included ACV and Basic Coverage. On September 16, Davis instructed Isbell that French would like to go with the second option: $35,660 premium, $25,000 deductible, ACV, Basic Perils Coverage. That day, pursuant to Goodrich's request, coverage was bound. It is undisputed that the Policy was formed in Virginia.

On summary judgment, Goodrich alleges that BB&T never provided the quotation, the confirmation, or the Policy before the Incident. Goodrich also asserts that the Quotation Confirmation issued by CRC on September 8 stated that the buildings were vacant, warranted the Property was "40% occupied," and included an 80% co-insurance provision. [Doc. 125-24]. However, on September 17, CRC issued a Confirmation of Coverage Bound that noted the buildings were vacant, but neither included the 40% occupancy warranty nor 80% co-insurance provision. [Doc. 143-19]. Goodrich maintains that the Policy was "created and provided only after the October 8, 2008, loss had been reported, and the 40% occupancy warranty and 80% co-insurance provision miraculously reappeared, again after the loss." [Doc. 143, p. 12] (emphasis in original).[4]

Procedural History

---

[4] These allegations, however, prove to be largely irrelevant in light of the Court's conclusion that there was no meeting of the minds between BB&T and Goodrich with respect to the type of insurance coverage.

Faraday filed a Complaint for Declaratory Relief against Goodrich on July 27, 2010, requesting a determination as to its rights, duties, and obligations under the Policy. In addition to answering and alleging counterclaims, Goodrich promptly filed a Third-Party Complaint against BB&T and CRC[5] for 1) fraud; 2) breach of contract, if Virginia law applies, or, alternatively, if Georgia law applies, negligent procurement; 3) punitive damages; and 4) attorney's fees. With the Court's permission, Faraday subsequently amended its Complaint and alleged a claim for indemnity and/or contribution against BB&T in the event that it was liable for Goodrich's alleged loss.

In a previous Order, the Court granted Faraday's Motion for Summary Judgment. Specifically, the Court found that the Policy's Vacancy Permit excluded sprinkler leakage coverage from all buildings and all premises on the Property, regardless of vacancy. The Court accordingly dismissed Faraday's claims against BB&T and denied as moot BB&T's pending summary judgment motion against Faraday, as well as Goodrich's and Faraday's Motions to Exclude Expert Testimony. Consequently, BB&T and CRC's Motions regarding Goodrich's third-party claims are ripe for consideration.

---

[5] Goodrich also filed claims against Southwest Water Company ("SWWC"). However, pursuant to a Consent Order, SWWC was dismissed from the action. Goodrich's claims against SWWC regarding the cause of the Incident are currently in dispute in the companion case, Goodrich v. SWWC, 5:10-CV-452 (CAR).

## LEGAL STANDARD

Summary judgment must be granted if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996). Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment. See Anderson v. Lib. Lobby, Inc., 477 U.S. 242, 247-48 (1986). This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict. See id. at 249-52.

In reviewing a motion for summary judgment, the court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but the court may not make credibility determinations or weigh the evidence. See id. at 254-55; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together

11

with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law. Celotex, 477 U.S. at 323.

If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact (i.e., evidence that would support a jury verdict) or that the moving party is not entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(e); see also Celotex, 477 U.S. at 324-26. This evidence must consist of more than mere conclusory allegations or legal conclusions. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Summary judgment must be entered where "the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." Celotex, 477 U.S. at 323.

## DISCUSSION

In its Third-Party Complaint, Goodrich asserts two relevant claims against BB&T and CRC: fraud and breach of contract to procure insurance under Virginia law, or, in the alternative, negligent procurement under Georgia law. However, on summary judgment, Goodrich concedes summary judgment as to its fraud claims against BB&T and CRC. Accordingly, BB&T and CRC's Motions for Summary

Judgment [Docs. 125, 126] with respect to Goodrich's fraud claim are **GRANTED**. With respect to Goodrich's remaining claims, the Court will address on BB&T and CRC's Motions separately.

### A. BB&T's Motion for Summary Judgment

Goodrich argues that BB&T breached its oral contract to procure insurance. BB&T contends that an oral contract did not exist because there was no meeting of the minds regarding the type of insurance coverage. Because Goodrich concedes summary judgment as to its negligent procurement claim against BB&T, the Court will focus only on whether there is a genuine issue of material fact with respect to Goodrich's breach of oral contract claim.

Choice of Laws

This action is based on diversity of citizenship, and the Court is required to apply the choice of law rules Georgia, the forum state. See Klazon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487 (1941). Under Georgia law, the insurance policy is governed by the law of the state where the contract was made unless the application of the foreign law would be contrary to Georgia public policy. Gen. Tel. Co. of the Se. v. Trimm, 252 Ga. 95, 96 (1984); O.C.G.A. § 1-3-9. Here, the Policy was issued in Virginia,

and there is no indication or argument that the application of Virginia law would be contrary to Georgia public policy. Thus, Virginia law governs Goodrich's breach of contract claim.

Breach of Contract

Under Virginia law, an insurance professional "may be held liable where he has breached a contract to procure insurance." Coyne & Delany Co. v. Selman, 98 F.3d 1457, 1470 n.15 (4th Cir. 1996) (quotation omitted). The proponent of an oral contract to procure insurance must prove that a contract existed by clear and convincing evidence before establishing that it was breached. Walker Agency & Aetna Cas. Co. v. Lucas, 215 Va. 535, 211 S.E.2d 88 (1975) (oral contract to renew fire insurance).

The existence of an oral insurance contract, like any other contract, must be based upon mutual agreement. Hall v. Dobbins Ins. Serv., Inc., No. #L91-919, 1992 WL 884804, at *1 (Va. Cir. Ct. Jul. 14, 1992). In other words, there must be a meeting of the minds with respect to the essential terms. Dickerson v. Conklin, 218 Va. 59, 65, 235 S.E.2d 450, 455 (1977). The six elements of an insurance policy are: (1) the names of the parties to the contract; (2) the subject matter to be insured; (3) the risks insured against; (4) the commencement and period of risk undertaken by the insurer; (5) a statement of the premium; and (6) the conditions pertaining to the insurance. Yates v. Whitten

Valley Rental Corp., 226 Va. 436, 437, 309 S.E.2d 330, 331 (1988); see Va. Code § 38.2-305.

Here, reading the record in the light most favorable to Goodrich, there is no evidence that Goodrich and BB&T agreed upon the risks to be insured against. French told Paul that he wanted to protect the wood; however, French never explicitly communicated to Paul what specific risks he wanted to protect against. Moreover, Paul's acknowledgement that Goodrich wanted "special causes of loss," as stated in the Application, is, by itself, insufficient. There is no evidence that Paul was aware what specific special causes of loss Goodrich wanted to protect against. Indeed, the record is silent as to whether *Goodrich* even knew what special causes of loss it wanted to protect against.

Additionally, there is no evidence that the parties agreed upon, let alone discussed, the conditions pertaining to the insurance. "Conditions" of "coverage" include issues such as "co-insurance, deductibles, replacement cost versus actual fair market value, and similar important qualifying aspects and conditions of an insurance contract." Hall, 1992 WL 884804, at *2. Here, at best, French notified Paul that he did not want replacement cost coverage. However, French never specified which one of the remaining two options he preferred: ACV or actual amount coverage. Moreover,

15

there is no evidence in the record that the parties discussed, let alone agreed upon, co-insurance provisions.

Based on the foregoing, it is clear from the evidence in the record that there is insufficient proof that the parties mutually agreed upon the risks insured against and the conditions pertaining to the insurance. Accordingly, Goodrich's breach of contract claim against BB&T fails as a matter of law because it cannot establish that all of the essential terms of the oral insurance contract were agreed upon. Because BB&T is entitled to summary judgment over Goodrich's fraud and alternative negligent procurement claims, BB&T's Motion for Summary Judgment [Doc. 125] is **GRANTED**.

### B. CRC's Motion for Summary Judgment

The Court next considers CRC's Motion for Summary Judgment. On summary judgment, Goodrich contends that CRC negligently procured its insurance policy. CRC argues that it did not have any duty to procure insurance for Goodrich. Goodrich concedes that CRC is entitled to summary judgment over its breach of contract claim. Thus, the Court will focus only on Goodrich's negligent procurement claim.

Choice of Laws

Georgia's conflict laws used above to resolve the choice of laws for Goodrich's breach of contract claim against BB&T are inapplicable here because it is undisputed that there is no contract between CRC and Goodrich.  Notwithstanding, CRC does not oppose Goodrich's unexplained application of Georgia law.  Accordingly, without deciding whether Georgia law is the appropriate choice of law in this case, the Court will consider Goodrich's negligent procurement claim under Georgia law.

Negligent Procurement

Pursuant to Georgia law, "an insurance agent who undertakes to procure a policy of insurance for his principal but negligently fails to do so may be held liable to the principal for any resulting loss."  Lavoi Corp., Inc. v. Nat'l Fire Ins. of Hartford, 293 Ga. App. 142, 147, 666 S.E.2d 387, 392 (2008).  An essential element of this claim, as with any negligence claim, is that an insurance agent must have a duty to procure the insurance.  NE. Ins. Agency, Inc. v. Courson, 156 Ga. App. 321, 323, 274 S.E.2d 714, 716 (1980) ("In order for the doctrine of negligence to apply [in a negligent procurement claim], there must have been a duty on the part of the agency toward the principal.").

CRC argues that in its Third-Party Complaint, Goodrich admitted that an agency relationship with CRC did not exist.  It is well-settled that "a party is bound by the admissions in his pleadings."  Best Canvas Prods. & Supplies, Inc. v. Ploof Truck

17

Lines, Inc., 713 F.2d 618, 621 (11th Cir. 1981). Judicial admissions are "facts established not only beyond the need of evidence to prove them, but beyond the power of evidence to controvert them." Id. (internal quotation marks omitted). "Consequently, where a party asserts a particular fact in a pleading, he is estopped to deny it later." Columbus Bank & Trust Co. v. McKenzie Trucking & Leasing LLC, No. 4:07-CV-189 (CDL), 2009 WL 3526648, at *3 (M.D. Ga. Oct. 23, 2009). In the context of agency law, a party to the alleged principal-agent relationship can admit or deny the existence of the relationship and such an admission or denial will be binding as a fact, not a conclusion of law. Stallings v. Ford-Mercury, Inc., 242 Ga. App. 731, 733, 533 S.E.2d 731, 732 (2000). "The denial of the existence of an agency relationship may thus constitute an uncontradicted fact which will sustain a motion for summary judgment." Id.

Here, in pleading its negligent procurement claim, Goodrich alleges that CRC and BB&T are not its agents under Georgia law. Specifically, Goodrich states: "BB&T and CRC were agents of [Faraday] pursuant to [Georgia law] and cannot, as a matter of law, be agents of Goodrich. Thus, [Faraday] cannot be heard to claim that Goodrich is bound by the actions of BB&T and CRC, but rather, [Faraday] is itself bound by their actions." [Doc. 8, ¶ 58; ¶ 44 (same judicial admission under Virginia law)]. Goodrich has subsequently neither amended nor withdrawn these assertions. See Stallings, 242

Ga. App. at 733, 533 S.E.2d at 732 (noting that judicial admissions are binding on a party unless they are otherwise withdrawn or amended). Moreover, Goodrich did not respond to this argument in its Response Brief. Accordingly, because it is undisputed that Goodrich denied an agency relationship in its Complaint, Goodrich is now estopped from arguing on summary judgment that CRC is its agent and had a duty to procure insurance.

Notwithstanding, even disregarding its judicial admission, the Court concludes that Goodrich's argument on summary judgment still fails on the merits. In its Response Brief, Goodrich argues that CRC was its subagent and thus had a duty under the law to procure insurance for Goodrich. Section 33-23-1 of the Georgia Code states, "The term 'subagent' shall not include: … (B) An agent who places surplus lines insurance with or without a surplus lines broker only with respect to each surplus lines insurance." O.C.G.A. § 33-23-1(a)(16)(B).

Here, it is undisputed that CRC was a surplus lines broker for Goodrich, and thus, pursuant to Section 33-23-1, CRC is specifically excluded from being Goodrich's subagent. Moreover, while the record indicates that BB&T was Goodrich's agent, Goodrich has not shown that it specifically empowered BB&T to authorize and appoint subagents. See O.C.G.A. § 10-6-5 ("[A]n agent may not delegate his authority

to another unless specifically empowered to do so."). Thus, even when disregarding its judicial admissions, Goodrich's subagency argument nevertheless fails as a matter of law.

Accordingly, the Court concludes that CRC is entitled to summary judgment with respect to Goodrich's negligent procurement claim. Because CRC is also entitled to judgment as a matter of law as to Goodrich's fraud and alternative breach of contract claims, CRC's Motion for Summary Judgment [Doc. 126] is **GRANTED**.

## CONCLUSION

Based on the aforementioned, Defendant BB&T's Motion for Summary Judgment [Doc. 125] and CRC's Motion for Summary Judgment [Doc. 126] are **GRANTED**. In light of the Court's instant finding, BB&T and CRC's Joint Motion to Exclude the Expert Testimony of Dale R. Wheeler and Rubin Shmulsky [Doc. 128] is **DENIED as moot**.

**SO ORDERED,** this 20th day of July, 2012.

S/ C. Ashley Royal  
C. ASHLEY ROYAL  
UNITED STATES DISTRICT JUDGE

LMH/aes/ssh